**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MALCOLM T. BYRD,

                    Plaintiff,

      v.

CITY OF PHILADELPHIA
DEPARTMENT OF PUBLIC HEALTH
/ COMMISSIONER'S OFFICE,

                    Defendant.

Civ. No. 05–2877

**OPINION**

April 7, 2008                                          Pollak, J.

       Plaintiff Malcolm Byrd has sued defendant City of Philadelphia, alleging

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the

Pennsylvania Human Relations Act, 43 P.S. § 955.[1]  The crux of Byrd's suit is that

defendant, in failing to promote Byrd, an African American, to the directorship of Health

Center #9, first on a temporary basis, and second on a permanent basis, in favor of Joan

Bland, a white person, discriminated against him on the basis of his race.

       The court, having denied defendant's motion for summary judgment, held a three-

---

[1] Because plaintiff's Title VII and PHRA causes of action are substantially the same, the
court will not distinguish between them.

day bench trial in this matter on January 15, 16, and 17, 2008.  In light of the findings of

fact and conclusions of law that follow, the court will now enter judgment in favor of

defendant City of Philadelphia, and against plaintiff Malcolm Byrd.

I.      Findings of fact

        A.      Plaintiff's background

        Plaintiff Malcolm Byrd is a longtime employee of the City of Philadelphia

Department of Public Health.  He began working for the Department in 1988 as a Mental

Health Coordinator. Tr. 1-24.   He continued in that position until 1995, when he was

transferred to a project management position in the health commissioner's office.  Tr. 1-

29; Pl.'s Ex. 1.  In 1999, Byrd moved to the Ambulatory Health Services division, where

he began working as an assistant director of an ambulatory health center.  Tr. 1-29.

Between 1999 and 2002, Byrd served as assistant director of three different ambulatory

health centers (Health Centers #4, 5, and Strawberry Mansion).  Tr. 30, 39, 44.  In 2002,

he was transferred to the ambulatory health services division's central office.  Tr. 1-61.

In 2003, the Health Department "loaned" Byrd to the Mayor's Office of Faith Based

Initiatives in order to help him complete a requirement for a graduate program in

ministry.  Tr. 1-99, 100.  As of the date of trial, Byrd was still serving in that position.  Tr.

1-21.  His civil service title is Mental Health Emergency Services Coordinator 2.  Tr. 1-

22.[2]

_____

        [2] It appears that there is often a difference between a city employee's civil service title
and his working title.  The former matches up to a particular set of job specifications and salary

Byrd received the degrees of Bachelor of Arts in human services administration in 1984, Master of Education in 1986, Master of Government Administration in 1993, Master of Theological Studies in 2004, and Master of Divinity in 2007.  Pl.'s Ex. 1.  He is presently pursuing a doctoral degree in ministry.  Tr. 1-87.

B.      The ambulatory health management track

Between 1999 and 2002, it appears that Byrd was on track to be hired as director of an ambulatory health center.  According to Donna Jones, the health department's former personnel director, very few people within the department had the management experience required for promotions.  Tr. 2-13.  Thus, the department developed an informal practice of promoting departmental personnel to higher-level positions on a temporary basis.  *Id.*  Under the civil service regulations, these promotees could be paid "out-of-class" (that is, as though they had been promoted) for a period of six months, after which they had to return to their usual pay grade for the duration of the temporary assignment.  *Id.*; *see also* Phila. Civ. Serv. Regs. 13.011.

The position at issue in this case, director of Health Center #9, carried the civil service title "Health Services Administrator 2."  To qualify for promotion to that title, a person had to have (1) "a master's degree from an accredited college or university in public administration, industrial management or engineering, business administration,

---

ranges published by the city personnel department.  *See* City of Philadelphia Personnel Department, Job Class Specifications Index, *available at* http://www.phila.gov/personnel/specs/index.html. The latter is more descriptive of the particular job the person performs.

hospital administration, public health, or a master's degree in political science with major concentration in public administration," and (2) "[o]ne year of public health administrative experience in a large complex personal health services agency performing the administrative supervision of health science personnel engaged in the delivery of personal health services directly to patients."  Pl.'s Ex. 6.  Failing either of these requirements, a person could also qualify by having "[a]ny equivalent combination of education and experience determined to be acceptable by the Personnel Department . . . ." *Id*.  According to Jones, a common means of helping department personnel qualify for the experiential potion of the specification was to promote the person to a position as an assistant or acting health center director.  Tr. 2-13.

C.      Byrd's first promotion attempt

As stated, it appears that Byrd was "on track," so to speak, to become a health center director when the department began moving Byrd through assistant director positions at various health centers.[3]  In any event, Byrd applied for a promotion to a Health Services Administrator 2 position.  He took and passed a civil service exam, and was placed fourth out of four on an eligibility list.  Tr. 1-66.  According to Jones, this was common practice: when the number of applicants for a promotion exceeded the number of available positions, the central personnel office administered either an oral or written exam.  Tr. 1-168–69.  Passing applicants were then placed, in order of their scores, on the

_____

[3] Indeed, David Ryba, ambulatory service's director of operations during part of the relevant period, described the track as an "apprenticeship."  Tr. 2-62.

eligibility list.  *Id.*  As time passed, the three people who placed above Byrd, two of whom are, like Byrd, African American, were promoted into available positions.  Tr. 1-93.

       D.     Byrd's difficulties within, and partial exit from, the health department

      According to Byrd, he received only positive feedback from his supervisors at Health Centers #4 and 5, respectively, Stuart Katz and John Magill.  Tr. 1-37, 41–44.Byrd testified that he had a more difficult relationship with his supervisor at Strawberry Mansion, Carmen Paris.  Tr. 1-55.  Byrd believes that he was ill-treated by Paris because of his race.  He testified that Paris treated all of her African American colleagues "in a very harsh, disrespectful way."  Tr. 59.  Moreover, he described her demeanor towards him as:

> usually rude, unkind, mean, questioning my judgment, questioning my speech pattern, suggesting that I was condescending, [that] I didn't belong in that setting . . . challenged my writing.  I think anything that she had an opportunity to make . . . a negative statement about, she did.  Challenged my relationship with the managers and my assessments of their abilities and performance.

Tr. 56–57.  On cross-examination, Byrd stated that Paris "suggested [Byrd] needed to be in an academic environment . . . not in a health center."  Tr. 102.

      In 2002, after spending approximately one year at Strawberry Mansion, Byrd was transferred to a position in the ambulatory services central office.  Tr. 1-61.  This transfer, according to Byrd, was not voluntary.  Tr. 1-62.  He testified that he received no official explanation for the move.  *Id.*  Byrd further stated that he understood that the transfer

came at Paris's request, but the City objected to that testimony, presumably on hearsay grounds, and the court ultimately sustained the objection. Tr. 1-61-62. It appears that Byrd's understanding of the reasons for his transfer came from a conversation he had with Stuart Katz. Tr. 1-61. Katz's statements to Byrd about the reasons for the transfer are indeed out-of-court statements, not made by the declarant, and submitted for the truth of the matter asserted. *See* Fed. R. Evid. 801 & 802. As these statements seem not to fit within any hearsay exceptions (and, moreover, plaintiff directed the court to none), the court did not allow that line of testimony to continue, and cannot accept into evidence plaintiff's statement that the transfer came at Paris's request, as there appears to be no non-hearsay basis for that assertion. The court does credit Byrd's testimony, however, that the transfer was involuntary and that he received no explanation for it from the city. In addition, the court notes that it appears that the transfer to the central office was not part of the "apprenticeship" that Byrd was undertaking.

At the central office, Byrd worked directly under David Ryba, then director of operations for ambulatory health services. Tr. 1-62. Byrd described his job as producing reports and performing analyses when requested by Ryba. According to Ryba, Byrd did an "adequate job." Tr. 2-59.

In November 2003, Byrd, at his own request, was loaned to the Mayor's Office on Faith-Based Initiatives. Tr. 1-99-100. Byrd's position in the mayor's office aided him in completing the requirements for one of his theological degrees, and it is the position that

Byrd still holds. *Id.* Under the mayor's office's arrangement with the health department, Byrd retains his civil service title and pay grade, and continues to be paid by the health department. Tr. 1-101.

      E.      Joan Bland's temporary appointment to direct Health Center #9

      In 2003, the directorship of Health Center #9 became vacant, and it fell to Ryba, in consultation with others, to select someone to fill the position on a temporary basis. Tr. 2-60, 83. According to Jones, because the department had not been authorized to fill the position on a permanent basis, no eligibility list was in force. Tr. 1-184-85. Jones also testified that once an eligibility list was reduced to one person, it became an "incomplete certification," and was no longer binding on hiring officials. Tr. 184. This, Jones testified, preserves the "rule of two," a policy enshrined in the Philadelphia Home Rule Charter that hiring officials are always given the choice of two candidates. Tr. 2-20-21, *referring to* Phila. Home Rule Charter § 7-401(h) & annotations. In deciding who to promote, Ryba apparently settled on two candidates: Joan Bland and Malcolm Byrd. Tr. 2-83.

      Bland, a nurse, was at that time working as health center coordinator for Health Center #5. Tr. 1-122. Jones described this position as "work[ing] right under" the health center director. Tr. 2-25. Prior to joining the health department, Bland worked for 13 years as director of the neonatal intensive care unit at Thomas Jefferson Hospital. Tr. 1-125. She held a master's degree in nursing, Tr. 1-124-25, but not in one of the degrees

specified by name as acceptable for promotion to the Health Services Administrator 2 title, *see* Pl.'s Ex. 6.

Around 2003, it appears that there was some debate within the health department as to whether a master's degree in nursing should be considered the equivalent of those degrees listed in the Health Services Administrator 2 specification.  Tr. 2-4.  Ryba testified that he vocally supported viewing the degree as equivalent and that, at some point, he was told by the health department personnel office that it would be permissible to consider the degree as a satisfactory qualification for a Health Services Administrator 2 position.  Tr. 2-74-76.

To decide between Bland and Byrd, Ryba consulted with each person's previous supervisors.  Ryba testified that Byrd's supervisors—Katz, Magill, and Paris—were unanimous in opining that Byrd would not be a particularly good choice for health center director because he did not possess the requisite skills.[4]  Tr. 2-85.  More specifically, Ryba testified that Paris voiced concerns about Byrd's skills in interacting with employees.  Tr. 2-66.  As to Bland, Ryba testified that her supervisors—Magill and Arnold Rudokevich, Tr. 2-92-93—agreed that she was ready to become a health center

---

[4] Again, the court will not rely on these out-of-court statements by Magill and Paris for the truth of the matters asserted (Byrd's abilities).  Indeed, the court takes no view as to whether Byrd would make a good health center manager.  Rather, the court relies on this testimony merely to establish that Ryba was given these assessments of Byrd's abilities, and that they could have formed the basis of his decision.

director.[5]  Tr. 2-85.  According to Ryba, it was on the basis of this consensus—and not on the basis of any race-related factor—that Bland was offered the temporary position.  Tr. 2-85-86.

The court credits Ryba's testimony.  His account of the decision-making process was cogent and reasonable; moreover, his demeanor and affect were believable.  Indeed, in light of Bland's extensive experience at Thomas Jefferson Hospital and the witness' description of the health center coordinator position, it is not difficult to understand why one might be eager give Bland the opportunity to serve as an acting health center director.  Thus, the court finds that Ryba made his decision for the reasons he gave—that is, the consensus among Bland and Byrd's supervisors that Bland was ready to run a health center, whereas Byrd was not—and not for any reasons related to race.

Much of Byrd's argument—at trial and in post-trial submissions—revolves around his contentions (1) that Bland's master's degree in nursing did not qualify her for the position according to the city's own specifications, and (2) that Byrd, as the only remaining person on the eligibility list, should have been offered the temporary position automatically.

On these issues, it is important to note that the ultimate question in this trial is not whether the city appropriately followed its civil service regulations.  This court cannot award relief directly on the basis of any city-law violations; rather, the court is confined to

_____

[5] Again, the court takes no view on the issue of whether Bland would make a good health center director; it merely credits that Ryba was given positive assessments of Bland's abilities.

the causes of action asserted in the complaint, which are violations of Title VII and the

PHRA.  As explained in the court's summary judgment opinion, evidence that the city did

not follow its own regulations may be probative of an untoward motive, such as race

discrimination, but it is in no way dispositive on that point.  *Byrd v. City of Phila.*, 2007

WL 3231698, at *4 (E.D. Pa. Oct. 30, 2007).

This court has no occasion to reach a legal conclusion on the issue of whether city

regulations permitted Ryba to appoint Bland to the position without one of the specified

master's degrees, as the court finds, as a matter of fact, that Ryba sincerely believed that it

was permissible for him to do so.  Moreover, the court finds that he sincerely believed

that Bland's educational achievements were adequate for the job.  In similar fashion, the

court finds that Ryba sincerely believed that he was not required to select Byrd because of

his position on the previous eligibility list.  Any rule-breaking on Ryba's part was, the

court finds, unintentional, and the result of a good-faith effort to put the best person in the

job.  Therefore, the court does not infer any racially discriminatory motive from Ryba's

placement of Bland in the disputed position, despite her lack of a master's degree in

administration, and despite Byrd's placement on the eligibility list.

Donna Jones's testimony makes Ryba's testimony with regard to his understanding

of the civil service process all the more credible.  According to Jones, the health

department's chief human resources officer, when making a temporary out-of-class

promotion, a supervisor was not required to hire from an eligibility list.  Tr. 1-185-85.  I

find that Jones's testimony was credible—in the sense that I believe she accurately conveyed her good-faith understanding of the city's civil service regulations (and their interaction with the home rule charter).  It makes good sense that Ryba, a hiring official within the health department, would have the same understanding as Jones regarding temporary out-of-class promotions, as Jones would naturally be (and, according to Ryba's testimony, was) the person to whom Ryba would turn for clarification of the regulations. Tr. 2-76-78.  Whether the Jones-Ryba interpretation is correct as a matter of city law is not for this court to say; for purposes of this case, it is sufficient that this court finds that Jones and Ryba, in good faith, believed that their understanding of city regulations was correct.  This finding undermines Byrd's contention that Ryba subverted the city's regulations in order to give effect to his own racial preference.

It is clear that Byrd believes that the reason he and Paris had a difficult relationship was that she disliked African Americans.  On this record, however, the court has no evidence  that this is true, except for plaintiff's subjective beliefs, which, though likely sincere, do not establish the proposition by a preponderance of the evidence.  Moreover, it does not appear that Paris unduly influenced Ryba's decision.  Ryba testified that his decision was based on the unanimous opinions of Byrd's former supervisors, only one of whom was Paris.  Though Ryba admitted to a previous romantic relationship with Paris (prior to 2003, when the decision at issue was made), Tr. 2-68-69, and admitted that he and Paris are friends, *id.*, the court declines to find that he was influenced by any racial

-11-

animus that she may have harbored.  The bare fact of this prior relationship does not

convince the court that Ryba's testimony concerning his own assessment of Byrd, his

motives in making the hiring decision, and his account of the reports he received from

others, was untruthful.

Byrd also makes much of the fact that the city has produced no documentation

pointing to unsatisfactory performance.  From this, he urges the court to conclude that his

performance was satisfactory, and that any argument otherwise is merely the City's

attempt to invent a *post hoc* justification for its actions.  The court places less stock in the

lack of documentation than he would.  None of the city's witnesses claimed that Byrd did

a sub-par job.  Instead, Ryba testified that Byrd did an "adequate job."  Tr. 2-59.

Moreover, what Ryba testified he heard from Byrd's former supervisors was not that Byrd

was a disappointing or bad employee, but merely that Byrd had not developed the skills to

be a health center director.  Even Paris, according to Byrd, leveled only the criticism that

he belonged in an academic setting.  Tr. 1-102.  While these assessments are not entirely

complimentary—particularly to a person who wants to be an administrator—they do not

seem to be the stuff of formal reprimands, and so the fact that there are no formal

reprimands on record is not surprising, nor does it suggest any inconsistency in Ryba's

conclusion that Bland was more qualified for the position at issue.

F.     Joan Bland's permanent appointment to director of Health Center #9

In 2004, it was decided that the health department would fill the directorship of

Health Center #9 on a permanent basis.  Bland applied for the promotion and was placed

on the eligibility list, ranked second of two.  Byrd, having been previously qualified, was

also placed on the eligibility list, ranked first of two.  According to Jones, when one

candidate is left on an eligibility list, as was the case with Byrd, the department may, in

lieu of selecting that person automatically, solicit new applications.  Tr. 1-173.  When it

does so, a new list is generated on which the person from the old list is automatically

ranked first.  *Id*.  This ensures that the person from the old list gets an interview, as the

department may only interview and select from the top two people on the list.  *Id*.  Bland

was apparently the only other applicant, as she was placed second out of two, and,

apparently not required to take an examination.  According to Jones, when no

examination was needed to rank the applicants, the examination could be waived.  Tr. 2-

31.  Here, it would not seem that any examination was necessary, as the two candidates'

rank order was determined by Byrd's appearance on the prior eligibility list.

In keeping with Jones's explanation of the process, the department invited both

Byrd and Bland to interview for the position.  Byrd was, at the time, working in the

mayor's office when he was invited to interview for the position.  *See* Tr. 1-76.  Bland

was still working as acting director of Health Center #9.

Dr. Thomas Storey, then medical director for ambulatory health, chaired the three-

person panel that interviewed the candidates.  Tr. 2-103.  The other two panelists were

Janet Stevenson and Linda Cutler, the two regional managers of the ambulatory health

centers.  *Id.*  Stevenson and Cutler were the people to whom the health center directors

reported.  *Id.*

The panelists generally asked questions about the candidates' managerial styles

and knowledge of the health centers, which included posing to each candidate

hypothetical situations to garner how the candidate would respond.  Tr. 1-139-40, 2-104,

3-31.  According to Byrd, his interview lasted 20 to 25 minutes.  Tr. 1-78.  According to

Bland, her interview lasted about an hour and a half.  Tr. 1-149.  The interviewers did not

recall a time discrepancy, though none of them had any record of the amount of time

spent.  Tr. 3-22, 35-37.

The panel unanimously agreed that Bland was preferred to Byrd.  Tr. 2-105, 3-Tr.

3-32, 3-49.  Storey testified that while Byrd gave acceptable answers to the questions

posed, Bland's responses were more complex and in-depth, and generally displayed a

better understanding of the complexity of the job.  Tr. 3-19-20.  He was also particularly

impressed by Bland's experience at Thomas Jefferson Hospital.  *Id.*  Along those same

lines, Stevenson testified that Bland's answers to the interview questions were of higher

quality than Byrd's, and that she voted to offer the job to Bland.  Tr. 3-32.  Stevenson did,

however, describe both candidates as professional and well-prepared.  Tr. 3-33.  Cutler

testified that she was particularly impressed by Bland's experience at Thomas Jefferson

Hospital.  Tr. 3-48.  That aspect of Bland's resume, she testified, played a large role in her

coming to the conclusion that Bland was better suited to the position at issue than was

Byrd.  *Id.*

The court credits the testimony of Storey, Stevenson, and Cutler as to their reasons for preferring Bland to Byrd.  They all testified cogently, and the court finds that the reasons they gave—centering on the comparative quality of Bland's interview responses and her prior experience—were in fact their reasons for making their selection.  The court does not find that race played a part in the decision for any of them.

There is some evidence that Byrd's interview was shorter than Bland's.  From this, plaintiff asks the court to draw the inference that Byrd's interview was perfunctory, and that the interviewers did not give him a fair shot.  The court declines to take that inferential step.  It is possible that the interviews were of different lengths, but the court does not believe that any discrepancy occurred by design.  It is neither uncommon nor necessarily untoward for two interviews for the same position to vary in length: some candidates give longer answers than others; some give answers that prompt multiple follow-up questions, whereas some do not; and some candidates establish a rapport with the interviewers that naturally leads to a more lengthy conversation.  In light of Storey's credited testimony that Bland's answers were more in-depth and complex, the court finds that any time discrepancy was the result of the natural flow of the interview, not of any short-changing of Byrd, and certainly not of racial discrimination.

Byrd also points out that there is some indication that the panelists were provided with little more than the candidates' resumes before the interview.  In other words, they

were not provided with all of the documentation—including Byrd's several positive

performance evaluations—that the city possessed.  But there is nothing in the record to

indicate that this deviated from the usual practice, and the city is certainly free to

constitute an interview process however it wishes.  The court sees no reason from this

record to infer from the interview process any nefarious motive—and, most importantly,

no motive related to race.

II.   Conclusions of law

As the parties note, Title VII and PHRA claims alleging disparate treatment on the

basis of race are evaluated under the familiar *McDonnell Douglas* burden-shifting

framework.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  Prong one of

that three-part test requires that plaintiff make out a prima facie case of discrimination.

*See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Ed.*, 470 F.3d 535, 539 (3d

Cir. 2006).  Here, the parties agree that Byrd did so; thus, the court need not address the

issue further.  Prong two requires that the employer come forward with evidence of a

race-neutral reason for the employer's hiring decision.  *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792, 803 (1973).  Here, the court concludes that the city met its burden

of production as Ryba, Storey, Cutler, and Stevenson, as detailed in the findings of fact,

testified to reasons based on their comparative assessments of Byrd and Bland's

qualifications, and not based on race, for making their hiring decisions.

The prima facie case having been made, and the city having come forweard with

race-neutral reasons for its decisions, the *McDonnell Douglas* framework, having served

its purpose, largely falls away.  *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347

n.1 (3d Cir. 1999) ("Once the judge finds that the plaintiff has made the minimum

necessary demonstration (the 'prima facie case') and that the defendant has produced an

[race]-neutral explanation, the burden-shifting apparatus has served its purpose, and the

only remaining question—the only question the [factfinder] need answer—is whether the

plaintiff is a victim of intentional discrimination." (citation omitted)).  Accordingly, the

issue to be decided at trial is whether the plaintiff proves by a preponderance of the

evidence that the defendant, in making the decision at issue, discriminated against him on

the basis of his race.

     As the above findings of fact reflect, the court in this matter is unable to find that

plaintiff proved discrimination.  Rather, the court finds that the various city decision

makers—Ryba, Storey, Stevenson, and Cutler—testified accurately as to their reasons for

promoting Bland rather than Byrd.  These reasons, centering primarily on (1) Bland's

experience, which was perceived to be superior to Byrd's, (2) her prior performance

within the department, which was reported to be superior to Byrd's, and (3) her responses

to the interviewer's questions, which were thought to reflect a better appreciation of the

complexity of the position, are race-neutral.  Moreover, the court is unable to find that

those reasons were pretextual, or that race played into the decision in any way.

     Because the court is unable to find by a preponderance of the evidence that, in

failing to promote Byrd to the positions of temporary director and permanent director of Health Center #9, the City discriminated against Byrd on the basis of his race, the court must conclude that, on this record, the city has not violated Title VII of the Civil Rights Act of 1964, or the Pennsylvania Human Relations Act, as the amended complaint alleges.  Therefore, the court will enter judgment in favor of defendant City of Philadelphia, and against plaintiff Malcolm Byrd.

An appropriate order of judgment follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MALCOLM T. BYRD,

               Plaintiff,

    v.

CITY OF PHILADELPHIA
DEPARTMENT OF PUBLIC HEALTH
/ COMMISSIONER'S OFFICE,

               Defendant.

Civ. No. 05–2877

**JUDGMENT**

On the basis of the attached findings of fact and conclusions of law, reached following a bench trial, it is hereby ORDERED that JUDGMENT be entered in this matter on all counts against plaintiff Malcolm Byrd and in favor of defendant City of Philadelphia Department of Public Health / Commissioner's Office.

BY THE COURT:

April 7, 2008

/s/ Louis H. Pollak
_____
Pollak, J.